## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## HELENA DIVISION

| | |
|---|---|
| MICHELLE COLLER GABLE, | **Cause No. CV 20-52-H-BMM-JTJ** |
| Petitioner, | |
| vs. | **ORDER** |
| JENNIE HANSEN; ATTORNEY GENERAL OF THE STATE OF MONTANA, | |
| Respondents. | |

Petitioner Michelle Coller Gable ("Gable") is a pro se state inmate seeking federal habeas corpus relief pursuant to 28 U.S.C. § 2254. Pending before the Court is her § 2254 petition and brief in support. (Docs. 1 & 2.) Respondents complied with the Court's directive to file documents from the Montana state court record. *See*, (Docs. 7-1 to 7-21 & 8-1.) The Court advised Gable that the bulk of her claims appeared to be procedurally defaulted and was directed to show cause as to why they should not be dismissed. (Doc. 9.) Gable timely responded. (Docs. 10 & 11.)

Gable sought leave to amend her petition and requested that this matter be stayed. (Docs. 15 & 16.) A stay was imposed. (Doc. 17.) Gable ultimately elected not to amend her petition. It is appropriate to lift the stay and complete the prescreening of this matter. The petition will be denied and dismissed for the reasons explained below.

1

## I.    Background

In 2013, a Lewis and Clark County jury convicted Gable of two counts of Deliberate Homicide for the murder of her husband Joseph Gable ("Joe") and the woman with whom he lived, Sunday Cooley Bennett ("Sunday").  Gable was sentenced to the Montana Women's Prison for two consecutive 100-year sentences.

The Montana state district court summarized the crimes and the underlying proceedings:

> In the early morning hours of October 13, 2011, Petitioner Gable shot and killed her estranged husband, Joe Gable, and his friend, Sunday Bennett. Gable was apprehended in the home of Joe where the crimes occurred.  The evidence that she committed the homicides was overwhelming.  Although Gable had previously lived in the home, she had been living out-of-state for over two years.  Gable brought two handguns to the home.  She gained access to the house with a key she obtained from the landlord, entered in the night while Joe and Sunday were sleeping, rifled through their belongings, sent hurtful texts on Sunday's phone and ultimately confronted Joe in the bedroom where he was sleeping with Sunday.  There was a physical struggle, and Joe was shot multiple times.  Gable pursued Sunday outside the residence, fired at her as she sought help on a 911 call, and followed her back inside after she sought refuge by locking herself in the basement bedroom.  Gable shot through the door to gain access and shot Sunday six times.  She also gave statements at the scene implicating Sunday as the shooter, thereby delaying first responders from providing care to Joe and Sunday.  Gable submitted to an interview with law enforcement during which she provided statements incriminating herself.
>
> Within ten days of Gable's arrest, Randi Hood was appointed to represent her.  Hood was an extremely experienced criminal defense attorney who had handled more than fifty homicide cases.  In August 2012, J. Thomas Bartleson was assigned as co-counsel.  Bartleson was also an experienced trial lawyer, both in the United States Army Judge Advocate General's Corps and in the Major Crimes Unit of the Montana Office of Public Defender.  Upon assuming Gable's defense, Hood filed notice of affirmative

2

defenses of justifiable use of force and lack of mental state due to mental disease or defect. The defense regarding mental state was subsequently withdrawn.

In January 2012, while in jail, Gable cut her arms with a razor blade. When found, Gable was clutching a plastic bag containing documents. The bag was seized and later searched in front of Hood for a possible suicide note. On March 6, 2012, Hood moved to suppress as evidence the papers found in the bag as privileged attorney-client communication. The Court granted the motion in July 2012.

Based on her behavior in the detention center and her self-harm, the State requested an examination to determine whether Gable was competent to proceed. The State agreed that the evaluation would be withheld from the State unless it found Gable incompetent. The motion was granted, and Gable was evaluated by clinical psychologist Dean Gregg. Gregg found Gable to be fit to proceed, with some concern about the variability of her ability to assist in her defense. The evaluation, filed on May 14, 2012, was sealed from everyone except the Court and the defense.

In July 2012, Gable jumped from the second story tier in the detention center. Following the second apparent suicide attempt, at the request of Randi Hood, Gable was again evaluated for competency on July 17, 2012, by psychologist Bowman Smelko. Smelko found Gable was not fit to proceed. Gable was subsequently re-evaluated by psychologist Dean Gregg on September 5, 2012. Gregg could not reach a definitive conclusion regarding Gable's competency. The Court then ordered another competency evaluation- this time at the Montana State Hospital ("MSH"). Following a stay at the state hospital during which Gable was observed for an extended period and re-evaluated, the MSH issued a report concluding Gable was competent to stand trial. Smelko also concluded Gable was competent to stand trial in an evaluation report dated December 13, 2012.

At the final pre-trial conference held December 13, 2012, Gable's counsel indicated they were prepared to proceed to trial. The trial was held January 7 through 16, 2013. The jury found Gable guilty of two counts of deliberate homicide. A pre-sentence investigation and report was ordered. Hood asked that the PSI writer have access to all of Gable's pre-trial psychological evaluations. In addition to the PSI report, Gable submitted a statement asking to be committed to the custody of the Department of Health and

> Human Services for placements at the MSH.  Gable was sentenced to the
> Montana Department of Corrections Women's Prison for 100 years for each
> count of deliberate homicide, with the sentences to run consecutively, and
> was ordered to pay restitution and the costs of her public defender.

*See*, PCR Or. (Doc. 7-20 at 2-4.). These facts are presumed to be correct.  *See*, 28

U.S.C. § 2254(e)(1).

Gable timely filed a timely direct appeal in which she challenged the

imposition of fees related to her restitution payments and the cost of her public

defender.  The Montana Supreme Court affirmed the restitution amount and

declined to consider the argument regarding public defender costs because it was

not adequately preserved for appeal.  *See, State v. Gable*, 2015 MT 200, 380 Mont.

101, 354 P. 3d 566. After unsuccessfully pursuing postconviction relief ("PCR") in

the state district court, *see e.g.,* PCR Ord. (Doc. 7-20), and on appeal therefrom,

*Gable v. State*, 2020 MT 165N (Mont. June 23, 2020), Gable sought habeas review

in this Court.

Gable was represented by Hood and Bartleson during her underlying

criminal proceedings.  Penelope Strong ("Strong") represented Gable in her PCR

and PCR appellate.  Additional facts will be supplied below where appropriate.

## II.    Relevant Law

### A. Exhaustion/Procedural Default

Federal courts may not grant a writ of habeas corpus brought by an

individual in custody pursuant to a state court judgment unless "the applicant has

exhausted the remedies available in the courts of the State." 28 U.S.C.

§2254(b)(1)(A); see also *Coleman v. Thompson*, 501 U.S. 722, 731 (1991); *Rose v.*

*Lundy*, 455 U.S. 509 (1982). To exhaust state remedies, a petitioner must "fairly

present" her claims to the state's highest court in a procedurally appropriate

manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

A claim is "fairly presented" if the petitioner has described the operative

facts and the federal legal theory upon which her claim is based. *Davis v. Silva*,

511 F. 3d 1005, 1009 (9th Cir. 2008); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). A

petitioner must clearly alert the state court that she is alleging a federal

constitutional violation. *See, Petersen v. Lampert*, 319 F. 3d 1153, 1158 (9th Cir.

2003)(en banc). "Mere 'general appeals to broad constitutional principles, such as

due process, equal protection, and the right to a fair trial,' do not establish

exhaustion." *Castillo v. McFadden*, 399 F. 3d 993, 999, cert. denied, 546 U.S. 818

(2005).

A petitioner's claims may be precluded from federal review in two ways.

First, a claim may be procedurally defaulted in federal court if it was actually

raised in state court but found by that court to be defaulted on state procedural

grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally

defaulted if the petitioner failed to present it in state court and "the court to which

the petitioner would be required to present [her] claims in order to meet the

exhaustion requirement would now find the claims procedurally barred." *Id*. at 735 n. 1. If no remedies are currently available, the claim is technically exhausted, but procedurally defaulted. *Id*.; *Gray v. Netherland*, 518 U.S. 152, 161-62 (1996).

### B. AEDPA/*Martinez*

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that a federal habeas court may not grant relief to a state prisoner whose claim has already been "adjudicated on the merits in State court," 28 U.S.C. § 2254(d), unless the claim's adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by [this] Court," § 2254(d)(1), or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," Section 2254(d)(2); *see also, Johnson v. Williams*, 568 U.S. 289, 292 (2013). AEDPA substantially limits the power of federal courts to grant habeas relief to state prisoners, *Hurles v. Ryan*, 725 F. 3d 768, 777 (9th Cir. 2014), and "demands that state court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam).

As a general matter, habeas review of a claim that is not adjudicated on the merits/defaulted is barred unless a petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750. *Coleman* specifically held that ineffective assistance of counsel in

6

PCR proceedings cannot establish cause for a claim's procedural default. *Id.*  In

*Martinez v. Ryan*, however, the U.S. Supreme Court recognized a narrow

exception to the *Coleman* rule:

> Where, under state law, claims of ineffective assistance of trial counsel must
> be raised in an initial-review collateral proceeding, a procedural default will
> not bar a federal habeas court from hearing a substantial claim of ineffective
> assistance at trial if, in the initial-collateral review proceeding, there was no
> counsel or counsel in that proceeding was ineffective.

*Martinez v. Ryan*, 566 U.S. 1, 6-17 (2012); *see also, Trevino v. Thaler*, 596 U.S.

413, 423 (2013); *Shinn v. Ramirez*, 142 S. Ct. 1718, 1733 (2022). Accordingly,

under *Martinez* a Montana habeas petitioner may establish cause and prejudice for

the procedural default of a claim of ineffective assistance of trial counsel by

demonstrating that (1) PCR counsel was ineffective and (2) the underlying

ineffective assistance claim has some merit. *Cook v. Ryan*, 688 F.3d 598, 607 (9th

Cir. 2012) (citing *Martinez*, 566 U.S. at 14).

To establish "cause" under *Martinez*, a petitioner must demonstrate that PCR

counsel was ineffective according to the standard set out in *Strickland v.*

*Washington*, 466 U.S. 668 (1984). *Clabourne v. Ryan*, 745 F. 3d 362, 377 (9th Cir.

2014), *overruled on other grounds by McKinney v. Ryan*, 813 F. 3d 798, 819 (9th

Cir. 2015).  *Strickland* requires a demonstration "that both (a) post-conviction

counsel's performance was deficient, and (b) there was a reasonable probability

that, absent the deficient performance, the result of the post-conviction proceedings

7

would have been different." *Clabourne*, 745 F.3d at 377 (citation omitted).

To establish "prejudice" under the second prong of *Martinez*'s "cause and prejudice" analysis, a petitioner must demonstrate that her underlying ineffective assistance of trial counsel claim is "substantial." *Id.* In *Martinez* the U.S. Supreme Court defined a "substantial" claim as a claim that "has some merit." 566 U.S. at 14. The standard for finding a claim "substantial" is analogous to the standard for issuing a certificate of appealability. *Id.* at 14; *see Detrich v. Ryan*, 740 F.3d 1237, 1245 (9th Cir. 2013) (en banc). Under that standard, a claim is "substantial" if "reasonable jurists could debate whether the issue should have been resolved in a different manner or that the claim was adequate to deserve encouragement." *Id.* (citing *Miller-El I*, 537 U.S. at 336).

### C. Strickland

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668 (1984). "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986).

To obtain relief on a claim of ineffective assistance of counsel, a defendant must show both that her attorney provided deficient performance, and that

8

prejudice ensued as a result.  *Strickland v. Washington*, 466 U.S. at 687-96.  To establish deficient performance, the defendant must show that "counsel's representation fell below an objective standard of reasonableness."  *Id*. at 688.  A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation fell within the "wide range" of reasonable professional assistance.  *Id*. at 689. The reviewing court's scrutiny of counsel's actions or omissions in evaluating allegations of deficient performance remains highly deferential.  *Id*.  "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effect of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."  *Id*.  The defendant's burden is to show that counsel made errors so serious that he or she was not functioning as counsel guaranteed by the Sixth Amendment.  *Id*. at 687.

The second prong of the *Strickland* test requires a showing of actual prejudice related to counsel's performance. In order to establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

In addition, under AEDPA, "[t]he pivotal question is whether the state

court's application of the *Strickland* standard was unreasonable.  This is different from asking whether defense counsel's performance fell below *Strickland's* standard … A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101.  Accordingly, the federal court must engage in "a 'doubly deferential' standard of review that gives both the state court and the defense attorney the benefit of the doubt."  *Burt v. Titlow*, 571 U.S. 12, 15 (2013).

## III.    Gable's § 2254 Petition

As previously determined, all but two of the claims contained in Gable's petition, are procedurally defaulted.  *See e.g*., (Doc. 9 at 14-17.)  In relation to non-defaulted claims, Claims 1 and 9, Gable asserts the Montana Supreme Court unreasonably denied her relief and their decision should not be afforded deference under § 2254(d).  As to the remaining claims, Gable argues the default should be excused under the rule of *Martinez*, and, accordingly, this Court should consider the claims *de novo*.  (Doc. 2 at 10-12.)  Each set of claims will be addressed in turn.

### A. Claims Adjudicated on the Merits- Claims 1 & 9

These two claims are similar in nature and surround the defense presented at trial.  In Claim 1, Gable asserts that Hood erred in failing to purse a defense based

upon the lesser included offense of mitigated deliberate homicide,[1] in favor of presenting an affirmative defense of justifiable use of force/self-defense.  *See*, (Doc. 1 at 10-12); (Doc. 2 at 14-26.)  In Claim 9, Gable contends Hood provided ineffective assistance by failing to offer a jury instruction on mitigated deliberate homicide.  (Doc. 1 at 46-47); (Doc. 2 at 85-87.)

### Pertinent Background

In response to Gable's PCR petition, Hood and Bartleson presented affidavits indicating that Gable was adamant that her defense at trial would be justifiable use of force.  The Montana state district court noted that this fact was supported by Gable's pre-trial interviews and her own trial testimony.  *See*, (Doc. 7-20 at 6.)  Bartleson affirmed that he and Hood advised Gable her claim of self-defense was not viable.  (*Id*.)  The Montana state district court found that trial counsels' affidavits were clear that the defense of mitigated deliberate homicide had been discussed with Gable.  (*Id*. at 7.)  The Montana state district court found that Gable's bald assertions were flatly contradicted by all other evidence in the record. (*Id*.)  No support existed for Gable's claim that defense counsel did not adequately investigate or advise her regarding the defense of justifiable use of

---

[1] The statue in effect at the time of Gable's offense provided: A person commits the offense of mitigated deliberate homicide when the person purposely or knowingly causes the death of another human being but does so under the influence of extreme mental or emotional stress for which there is reasonable explanation or excuse.  Mont. Code Ann. § 45-5-103 (2011).

force.  (*Id*. at 6-7.)

Similarly, the Montana state district court found Gable's claim that counsel erred by failing to present a jury instruction on mitigated deliberate homicide had no support in the record.  Before settling instructions defense counsel spoke with Gable regarding whether to offer instructions on mitigated deliberate homicide. Hood had prepared these instructions.  (*Id*. at 8.)  Hood stated she had many discussions with Gable about the lesser included offense and believed Gable understood the ramifications of not pursuing mitigated homicide.  (*Id*. at 8-9.) Based upon the evidence, the Montana state district court found not credible Gable's claim that the first time she heard about mitigated deliberate homicide was during the instruction phase.  (*Id*. at 9.) Gable's claims related to a potential mitigated deliberate homicide defense were not supported by the record or the evidence before the court. Gable failed to meet the first *Strickland* prong of deficient performance.  (*Id*. at 8-9.)  The claims were denied.

The Montana Supreme Court held that Gable's argument related to the failure to pursue a mitigated deliberate homicide defense was defeated by the record.  The Montana Supreme Court concluded that Gable's counsel discussed the lesser included offense with Gable, but Gable insisted that she was not interested in pursuing such a defense.  Gable also rejected a plea offer to a mitigated deliberate homicide.  Gable failed to meet her burden of contradicting these facts on appeal.

12

Gable could not meet the first prong of *Strickland*. The claim necessarily failed. *Gable v. State*, 2020 MT 165N, ¶ 13 (Mont. June 23, 2020).

### Gable's Argument

Gable was informed of the showing she would need to make under 28 U.S.C. § 2254(d) in order to survive deferential review. (Doc. 11.) Gable contends that the Montana state courts made an unreasonable determination of the facts under § 2254(d)(2). *See generally*, (Doc. 14.) Gable notes that in denying her relief the Montana state courts primarily relied upon the following documents: (1) the affidavits of Hood and Bartelson; and (2) Gable's 12/4/12 written rejection of a plea offer.

Gable points out that neither Hood nor Bartelson included a letter from her case file in which Gable was advised that counsel believed it was in her best interest to consider allowing them to pursue the included charge mitigated deliberate homicide. (*Id*. at 1-2.) Gable supplies an unsigned copy of this document. (Doc. 14-1 at 4-5.) Gable suggests that the absence of reference to this document by either Hood or Bartelson appears suspicious. Gable contends that no proof exists that Hood effectively discussed mitigated deliberate homicide with her. (Doc. 14 at 2.) Gable argues that no record in her case file documents a significant disagreement and/or critical decisions being made relative to her defense. (*Id*. at 2-3.)

Similarly, Gable notes the 12/4/12 rejection of the plea offer does not show that she understood, discussed, or rejected pursuing a defense of mitigated deliberate homicide at her trial. (*Id*. at 3.) Gable points to the fact that for much of the time that elapsed following the shootings, but prior to trial, she had been deemed "incompetent" by different health professionals. (*Id*. at 3-5.) For all of these reasons, Gable argues that the state courts unreasonably denied her claims in light of the evidence that was present in the record.

**Analysis**

Under § 2254(d)(2), habeas relief is available if the state court decision was based upon an unreasonable determination of the facts. *See Miller-El v. Dretke* (*Miller-El II*), 545 U.S. 231, 240 (2005). "[A] decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell* (*Miller-El I*), 537 U.S. 322, 340 (2003). A state court's factual determination is presumed correct, and a petitioner bears the burden of overcoming that presumption with clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see Miller-El I*, 537 U.S. at 340. A "factual determination is not unreasonable merely because [a] federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010); *see Brumfield v. Cain*, 576 U.S. 305, 314 (2015) (explaining that

14

§ 2254(d)(2) requires federal courts to "accord the state trial court substantial deference"); *Walden v. Shinn*, 990 F.3d 1183, 1196 (9th Cir. 2021), *cert. denied*, 142 S. Ct. 791 (2022); *Ayala v. Chappell*, 829 F.3d 1081, 1094 (9th Cir. 2016) ("A state court's factual findings are unreasonable if 'reasonable minds reviewing the record' could not agree with them.") (quoting *Brumfield*, 576 U.S. at 314).

The affidavits provided by Hood and Bartelson, two experienced trial attorneys, support their contention that Gable was repeatedly advised pursuing mitigated deliberate homicide, rather than self-defense, was in her best interest. Counsel believed Gable's self-defense case not to be viable given the seemingly insurmountable evidence against her and discussed this with Gable. The record before this Court supports defense counsels' position and the Montana Supreme Court's denial of these claims.

Gable snuck into Joe's home in the middle of the night and proceeded to snoop through his belongings, before surprising him. (Doc. 7-17 at 2, ¶ 5.) Joe previously had changed the locks on the home and had filed a restraining order against Gable. Gable obtained a key to the residence by contacting the landlord and advising him that her name was on the lease. (I*d*. at ¶ 7.) The forensic evidence revealed that Gable shot Joe first. Gable chased Sunday around the property before shooting her six times. (*Id*. at 4, ¶ 15.) During these events, Sunday called 911. The 911 call records the interaction between Sunday and

Gable, including Gable telling Sunday, "[y]ou stole my husband," and then shooting her.[2]  Gable was also recorded telling officers that Sunday was in the residence "with a gun," which likely delayed life-saving aid being rendered to Sunday.  (*Id.* at 2, ¶ 5.)  Joe made a dying declaration that Gable had shot both him and Sunday. (*Id.* at ¶ 6.)[3]  Forensic evidence showed Gable's tracks, in blood, and could be traced as she gunned down both victims.  (*Id.* at ¶ 9.)  Following the shootings, Gable gave a 98-page transcribed interview in which she incriminated herself.  (*Id.* at ¶ 8.)[4]

Gable was adamant to counsel that her actions were justified.  For this reason, the defense hired a crime scene expert.  The expert ultimately informed Gable's counsel that the evidence did not support Gable's story of self-defense, particularly as it related to Sunday.  Counsel determined that the expert would not be used at trial.  (Doc. 7-16 at 2, ¶ 9.)  Counsel included Gable in trial preparations. The defense team ensured that she reviewed all the evidence.  Gable provided detailed notes to counsel.  *See*, (Doc. 7-17 at 4, ¶ 14;13-25); (Doc. 7-16 at 2, ¶ 7.) The defense team, including counsel, their investigator, and support staff, spent a significant amount of time with Gable preparing for trial.  (Doc. 7-17 at 3, ¶ 12.)

The issue of mitigated deliberate homicide came up frequently, including

---

[2] *See also*, Trans. 911 Call (Doc. 7-8 at 39-40.)
[3] *See also*, Joe Gable Stmt. (Doc. 7-8 at 91-94.)
[4] *See also*, Gable Statement (Doc. 7-8 at 96-193.)

within the State's plea offer.  Gable believed her acts were justified, however, and was not interested in pursuing the lesser-included offense.  (Doc. 7-16 at 3-4, ¶ 15.) Gable rejected a binding plea agreement for 80 years, for the mitigated deliberate homicide of Joe.  Counsel believed this to be a fair offer that would minimize Gable's potential exposure at trial.

Gable proceeded to trial against the advice of counsel and persisted in pursuing self-defense claim.  (Doc. 7-17 at 2-3, ¶ 10.)  At no point during the rejection of the plea offer did Gable indicate that she did not understand the offer or the charge of mitigated deliberate homicide.  In fact, counsel and Gable discussed the charge and penalty during their plea discussions.  (*Id.* at 3-4, ¶ 13.) Counsel again discussed with Gable the issue of mitigated deliberate homicide before settling jury instructions. Counsel had prepared jury instructions for mitigated deliberate homicide.  Gable's questions and concerns throughout these discussions evidenced an understanding of mitigated deliberate homicide.  Counsel frequently discussed their concerns with Gable about mounting a self-defense claim.  Gable never wavered in her desire to pursue a claim of self-defense.  Gable expressed no interest in a lesser offense, because it would not result in her immediate release from custody.  (Doc. 7-16 at 4, ¶ 17.)

The Court appreciates that Gable was struggling with physical and psychological issues before trial.  The reports that Gable supplies indicate that her

overall stability and corresponding ability to participate in her defense did "wax and wane." *See e.g.,* (Doc. 14-1 at 9-47.)  The exhibits provided by defense counsel with Gable's handwritten notes also show, however, Gable's involvement in her case, her ability to process information, and her ability to give feedback and perspective in an articulate manner. *See,* (Doc. 7-17 at 13-16; 17-18; and 21-25.)

The Court further determines that the letter "missing" from defense counsel's respective affidavits lacks the value to which Gable ascribes.  Counsel turned their files over to Gable's PCR counsel in the years following Gable's convictions. *See,* (Doc. 7-16 at 5, ¶ 20.) It appears the letter may have been saved electronically but printed for PCR counsel later, based upon the contradicting dates contained in the letter.  It also appears pages are missing from the copy of the letter that Gable provides.  *See,* (Doc. 14-1 at 4-5.)  The Court attributes no fault to Gable for these deficiencies.

The letter shows, if anything, support for the position advanced by defense counsel.  The letter, or at least the portions contained within the record, explains the mitigated deliberate homicide statute, how defense counsel believed the statute applies to the facts of Gable's case. The letter also explains the potential exposure to Gable and the difference in penalties between conviction for mitigated deliberate homicide versus deliberate homicide.  The letter explicitly details the risk if Gable does not allow defense counsel to proceed on a mitigated deliberate defense theory

and that rejection of this strategy would be against the advice of counsel. (*Id*.) The record shows that counsel were asking Gable to allow them to argue for a lesser included offense of mitigated deliberate homicide before trial. (*Id*.)

Finally, the Montana trial court's summation of Gable's trial testimony demonstrates her persistence in pursuing self-defense at trial:

> You triggered the deaths of two people by your own obsessive actions. You testified at trial and you tried to say that it was a justified use of force. That was inconsistent with the evidence at trial. The superficial wound to your head does not support your argument. The wound to your husband's hand and the powder and residue on the two entrance wounds in his body do not support your contentions.

*See*, Sent. Trans. (Doc. 2-2 at 26:12-20.)

Gable has failed to show that the Montana Supreme Court's decision denying these claims was objectively unreasonable. *Miller El I*, 537 U.S. at 340. Gable has failed to present clear and convincing evidence to overcome the presumption that the Montana state court's factual findings and decision were correct. *See*, 28 U.S.C. § 2254(e)(1). These claims fail to satisfy the doubly deferential standard that governs ineffective assistance of counsel claims under AEDPA. *Titlow*, 571 U.S. at 15. Deference must be afforded to that decision. These claims will be denied.

## B. Defaulted Claims- Claims 2, 3, 4, 5, 6, 7, 8, 10

Gable relies upon *Martinez v. Ryan* to excuse the procedural default of each claim. Gable's defaulted claims fall into 3 categories: (1) those raised for the first

time on PCR appeal (Claim 2); (2) claims that were never presented in PCR proceedings or on PCR appeal (Claims 3, 5, 6, 7, and 8); and (3) claims raised in PCR proceedings, but not on appeal therefrom. (Claims 4 & 10). Each set of claims will be addressed in turn.

As an additional observation, the rule set out in *Martinez* applies only ineffective assistance of trial counsel claims. To the extent that Gable intends any of these claims to present other stand-alone issues aside from IAC, the default of such claims, including prosecutorial misconduct (Claim 3), due process (Claims 5, 6, 7, and 8) cannot be excused under *Martinez* and will not be considered. *See*, *Pizzuto v. Ramirez*, 783 F. 3d 1171, 1177 (9th Cir. 2015); *Hunton v. Sinclair*, 732 F. 3d 1124, 1126-27 (9th Cir. 2013).

### i.    Claim 2- raised for the first time on PCR appeal

Gable argues that Hood had provided ineffective assistance by presenting evidence relating to the source of the guns used in the shootings, despite having this evidence previously suppressed.

### Pertinent Background

As set forth above, while incarcerated at the Lewis and Clark County Detention Center in January of 2012, Gable cut her arms with a razor blade. Detention officers discovered her clutching a plastic bag of documents. Detention officers seized the bag and searched for a razor blade and/or suicide note. Included

in these papers were a document that could be construed as a suicide note, along with a long narrative account of Gable's life, that covered the events leading up to and surrounding the shootings.  *See*, (Doc. 7-8 at 266-435.)  Hood moved to suppress the papers found in the bag as privileged attorney-client communications. The Montana state district court held a suppression hearing, *see e.g*., (Doc. 7-8 at 195-264; 474-498.)  The suppression motion was granted.

Gable argues that Hood provided ineffective assistance when she elicited trial testimony from Gable on direct examination as to the origin of the two guns. Gable contends that this question represented a "key pivotal point" in the case and the prosecution had no evidence as to where the guns originated or how they entered the altercation.  *See*, (Doc. 10 at 3); *see also*, (Doc. 2 at 26-29.)  Hood initially asked Gable, "[w]hen you came into your home, did you have two guns with you?"  Hood then proceeded to ask Gable two more times during the examination where Gable had obtained the guns.

Gable asserts that absent Hood's questioning, the prosecution had no evidence of how the guns came into play, and accordingly any inference of Gable's intent was negated.  According to Gable, Hood's questions bringing the damaging testimony to light constituted "glaring ineffective assistance."  (Doc. 2 at 28.) Gable asserts that this testimony provided the prosecution evidence of Gable's intent to commit the crimes "wrapped in a bow," (*id*.) and shows that Hood must

have "sle[pt] through the law school class on the Fifth Amendment" by allowing Gable to incriminate herself. (*Id*. at 29.) Gable contends her conviction was obtained largely due to Hood treading upon her right to be free from self-incrimination. (*Id*.)

For purposes of *Martinez*, Gable asserts she has shown that Hood provided ineffective assistance. (Doc. 10 at 3.) Further, Gable argues that Strong provided ineffective assistance for raising this claim for the first time on PCR appeal, because an attorney providing even "minimal" effective assistance would have known that new claims cannot be presented on appeal. (*Id*.)(citing MCA § 46-21-105(1)(a)).

**Analysis**

As set forth above, under *Martinez*, Gable must prove both "cause" and "prejudice" to excuse her default. 566 U.S. at 10. To demonstrate "cause" Gable must show that "appointed counsel in the initial-review collateral proceeding, where the claim should have been raised, was ineffective" under the standards of *Strickland v. Washington*. *Id*. at 14. To establish "prejudice" under *Martinez*, the underlying trial counsel IAC claim must also be "a substantial one, which is to say … that claim has some merit." 566 U.S. at 14.

The cause and prejudice requirements are distinct: "[t]here is considerable overlap between these requirements, since each considers the strength and validity

22

of the underlying ineffective assistance claim." *Djerf v. Ryan*, 931 F. 3d 870, 880 (9th Cir. 2019). The Court will consider the prejudice prong of *Martinez* first to determine whether Gable's claim of ineffective assistance of trial counsel is "substantial." *See Dickinson v. Shinn*, 2 F. 4th 851, 858 (9th Cir. 2021).

The record demonstrates that Gable elected to pursue a defense of justifiable use of force. This strategy was made clear to the jury in Hood's opening statement: "Gable's defense is that she used justifiable use of force, that when deadly force was brought against her, she answered with deadly force." Trial Trans., (Doc. 7-2 at 161:11-13.) Hood also advised the jury that Gable would testify on her own behalf. *See e.g.*, (*Id*. at 168:23-24.) Before the defense presenting its case, Hood indicated that she and Gable would engage in a final discussion as whether Gable would testify. *See*, (*Id*. at 1059:3-5.) Gable did testify. Gable's protestations now about waiving her Fifth Amendment rights and incriminating herself ring hollow. Moreover, the justifiable use of force defense hinged upon Gable's beliefs and perceptions about what occurred on the night of the shootings and the amount of force that she used. Gable's testimony proved essential to her theory of the case.

The voluntary extended interview Gable provided to law enforcement following the shooting proved problematic. There were two guns involved in the shooting, a .38 revolver and a 9-millimeter semi-automatic pistol. Officers asked

23

Gable on at least fourteen occasions how or from where she obtained these

weapons. *See*, Gable Interview (Doc. 7-8 at 103, 104, 105, 110, 118, 123, 128-29,

136-37, 161, 170, 182, 187, and 192.)  In each instance Gable denied knowing

where the guns came from or provided an answer that was wholly unresponsive,

despite providing many other pertinent details surrounding the altercations with

Joe and Sunday and the timeline of events leading up to the shootings. *See*

*generally*, (*Id*. at 96-193.) It was apparent that the issue of the origin of and

location of the weapons before the shootings was going to be a central issue at trial

Gable initially provided a lengthy response during her direct examination.

Gable explained that she had intended to retrieve important documents and photos

contained in a black locked suitcase from a storage trailer.  When she brought the

suitcase back to her hotel and opened it, it did not contain the photos and items she

sought, but instead it held stuffed animals and the two guns she and Joe owned.

Gable thought that it was not safe to keep the guns in her hotel room. Gable

testified that she placed the guns in the trunk of her rental vehicle where they

remained.  *See*, Trial Trans. (Doc. 7-2 at 1108-1111.)

Gable acknowledged having taken the guns with her to Joe's apartment on

the morning of the altercation.  When questioned what she wanted to do with the

guns, Gable suggested she intended to return both firearms to Joe.  (*Id*. at 1110-

1111.) Gable initially provided a non-responsive answer when Hood asked Gable

24

what she had done with the guns on the morning in question. (*Id*. at 1115-1116.)

Gable finally stated that she put the guns halfway up the apartment stairs and

covered them with Joe's underwear and socks. (*Id*. at 1117: 6-12.) Gable then

described in detail the events that transpired, the shootings of Joe and Sunday, and

the aftermath. (*Id*. at 1117-1134.)

Hood briefly addressed this issue in her affidavit provided during PCR

proceedings:

> Gable and I made a joint decision to explain how the guns ended up
> with her at the house. While that information was in the suppressed
> materials, I determined that it was an issue to deal with since she did
> have the guns. Her explanation of having stored them in her car and
> wanting a safer place to put them was better than having the jury have
> no explanation of why Gable had the guns.

(Doc. 7-16 at 4-5, ¶ 18.)

A reasonable explanation exists as to why Hood pursued this line of

questioning, particularly considering the defense being offered by Gable. Contrary

to Gable's assertions, had the defense not addressed the issue, the jury could have

inferred that Gable obtained the weapons specifically for the purpose of lying in

wait to gun down Joe and Sunday. The government also could have asked Gable to

explain the origin and/or introduction of the firearms into the altercation on cross-

examination. The only two other witnesses who could testify about the location

and/or use of the guns were deceased. Hood deemed it advantageous, in the

absence of other testimony or explanation, to address the issue directly.

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690. "A disagreement with counsel's tactical decision does not provide the basis for declaring that the representation was constitutionally deficient." *Raley v. Ylst*, 470 F.3d 792, 799 (9th Cir. 2006).

Hood's decision to address the manner in which the guns were introduced into Joe's home was strategic and necessary to the defense. Moreover, it appears the decision was made with Gable's knowledge and participation. For these reasons, Hood's performance did not fall "outside of the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. The IAC of trial counsel claim is "insubstantial," for purposes of *Martinez* prejudice analysis, because lacks "some merit." *Martinez*, 566 U.S. at 14. The default of this claim is not excused under *Martinez* and will be dismissed.

### ii.    Claims 3, 5, 6, 7, 8- not presented in any collateral proceeding

Gable presented none of these claims were presented in the Montana state collateral proceedings or in the PCR proceedings on appeal. Gable generally faults PCR counsel Strong for failing to independently discover, investigate, develop, and present the facts supporting these claims in her PCR proceedings. *See*, (Doc. 10 at 2.) Gable argues that the Montana Supreme Court's observation that Gable's

appeal was "vague in its articulation" and the fact that Strong raised Claim 2 for the first time on PCR appeal, demonstrates Strong's overall ineffectiveness.  (*Id.*) The Court notes it is also entirely possible, however, that Strong considered these claims and determined the claims either lacked merit or found insufficient support in the record to present them in the PCR petition. Even if the Court were to accept that Strong provided ineffective assistance in the PCR proceedings, thus establishing *Martinez* "cause" to excuse the default, Gable cannot show the corresponding prejudice.  These claims all will be dismissed as procedurally defaulted without excuse.

### Claim 3- Hood provided ineffective assistance for failing to object to comments made by the prosecutor in voir dire (Doc. 10 at 3-4); *see also*, (Doc. 2 at 29-39.)

Gable claims the prosecutor, Leo Gallagher ("Gallagher"), used suppressed material, specifically information of where the guns came from, during voir dire and that Hood failed to object.  Gable also asserts Gallagher used voir dire to "indoctrinate" the jury and instruct them on matters of law.  Finally, Gable claims Gallagher improperly used guilt-assuming hypothetical questions. Gable provides select pages from the voir dire transcript in support of her claim. *See* (Doc. 2-4 at 5-24.)

The Sixth Amendment guarantees a criminal defendant a fair trial.  "One touchstone of a fair trial is an impartial trier of fact- 'a jury capable and willing to

decide the case solely on the evidence before it.'" *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 554 (1984) (*quoting Smith v. Phillips*, 455 U.S. 209, 217 (1982). The U.S. Supreme Court in *McDonough*, recognized that "[v]oir dire examination serves to protect that right by exposing possible biases, both known and unknown, on the part of potential jurors." *Id.* at 554. No hard-and-fast formula dictates the necessary depth or breadth of voir dire, *see United States v. Wood*, 299 U.S. 123, 145-46 (1936), and "[t]he Constitution…does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." *Morgan v. Illinois*, 504 U.S. 719, 728 (1992).

The crux of Gable's argument is that Gallagher used her privileged writings to allege how the guns came into play during the altercation. *See*, (Doc. 2 at 30.) Gable points specifically to Gallagher pursuing a line of questioning with the jurors about the idea of "bringing a knife to a fistfight." (*Id.* at 30-1.) Gable claims this information was illegally sourced and Hood should have objected.

A review of the transcript reveals that Gallagher did ask the jurors about this hypothetical: has anyone heard the term "bring a knife to a fist fight?" *See e.g.*, (Doc. 2-4 at 10.) A discussion was then held in context of use of force and what amount of force would be reasonable. Gable had injected this very issue into the trial by noticing up her affirmative defense of justifiable use of force. Gallagher talked to the jury in generalities: "If somebody brings a knife to a fistfight, is the

person that's the fist-fighter entitled to defend him or herself from the knife?" (*Id.* at 10:11-13.) There was forensic evidence that Sunday was unarmed along with evidence that could support a theory that Joe and Gable struggled with one of the weapons.

A juror responded that it "depends on the circumstances" and that they would want to see and hear more evidence when asked if the person that brings a knife to a fist fight that has escalated should be entitled to claim self-defense. (*Id.* at 10:15-22.) There was then discussion about all the things the prospective jurors would like to know in the hypothetical situation, such as if the knife-fighter had been threatened with violence, who was involved, if someone tried to retreat from a violent situation, how physically fit the parties were, etc. (*Id.* at 11-12.) The jurors also were informed that they would be instructed by the court on all the law surrounding use of self-defense. (*Id.*) Finally, the Court notes that Gallagher affirmatively acknowledged the government did not know the origin of the guns. Gallaher guessed that Joe likely acquired the guns during his military service. (*Id.* at 6: 3-4.)

The disagrees with Gable that Gallagher used unlawfully obtained information during voir dire. Gallagher properly explored the potential jurors' thoughts and feelings relative to the asserted defense of justifiable use of force. The questioning was not improper. Hood cannot be faulted for failing to object. Hood

29

did not perform deficiently. *Strickland*, 466 U.S. at 688.

Gable's claims that Gallagher unlawfully instructed the jury on the law and used "guilt assuming" hypotheticals prove similarly unpersuasive.  Gable again refers to the "knife in a gun fight" line of questions.  Gable also points to an inquiry posed to the panel: because there were two dead people, and Gable was not dead, did that necessarily mean that she was the aggressor? *See*, (Doc. 2 at 32.) Hood actually posed this question, not Gallagher, during the defense's voir dire. *See e.g.*, (Doc. 2-4 at 24); *see also*, (Doc. 7-2 at 134-35.)

Gable suggests that Gallagher made misrepresentations when he stated that the government alleged that the shooting had occurred during a "nasty separation" and that photos of the crime scene would be gruesome.  (Doc. 2 at 32-33.)  These facts did bear out in the presentation of the case.  Finally, Gable suggests that Gallagher committed error, to which Hood failed to object, when he stated, "I used to be a defense lawyer, and I was sandbagging the prosecutor…" (*Id*. at 34.) Reading this comment in context, Gallagher was relating a personal experience in which he learned a lesson about making presumptions. Years earlier, Gallaher had presumed a potential juror would be sympathetic to his client, but subsequently learned at the end of voir dire that this same juror believed his client to be a liar and stated this belief before the entire jury venire.  Gallagher's failure to inquire hurt not only his client's feelings, but also impacted the rest of the potential jury

panel. *See*, (Doc. 2-4 at 5:11-25.)  If anything, Gallaher related this story to impress upon the potential jurors the importance of being honest.

To the extent that Gallagher explored topics such as the burden of proof, the concept of innocent until proven guilty, direct versus circumstantial evidence, and the use of force, these were not instructions on the law, but constituted proper inquiry into types of issues members of the selected jury would have to confront and consider.  Hood explored these same issues during the defense's voir dire. *See generally*, (Doc. 7-2 at 98-138.)  None of this constituted "indoctrination," but rather reflected the parties' respective attempts at selecting an impartial jury.

Gable has not shown that Hood provided ineffective assistance. No basis existed for Hood to object to Gallagher's voir dire.  Gable has not demonstrated that she was denied an impartial jury.  Gable has not shown a reasonable probability that but for Hood's failure to object during voir dire, there would have been a reasonable doubt regarding her guilt. *See, Strickland*, 466 U.S. at 695.  No prejudice exists under *Martinez*.  Similarly, Strong did not provide ineffective assistance for failing to raise this claim in PCR proceedings.  The claim remains procedurally defaulted.

### Claim 5- Hood provided ineffective assistance by failing to request a continuance of trial, (Doc. 10 at 5); *see also*, (Doc. 2 at 44-50)

Gable begins her argument by citing to cases in which the incompetency of a defendant was central to their ability to assist in the defense and that the trial and

conviction of an incompetent individual violates due process. (Doc. 2 at 44-5.) Gable argues that she was unable to assist in her own defense for the bulk of her pretrial incarceration and cites to her own psychological evaluations. (*Id*. at 45-48.) Gable argues that insufficient time existed to prepare for trial as she was found competent to stand trial just one month before trial was scheduled to begin. (*Id*. at 48.) Gable states that during a pretrial hearing on December 16, 2021, Hood informed the Montana state district court that Gable did not feel ready to proceed to trial. Hood further informed the Montana state district court that the defense team was prepared. (*Id*. at 48-9.)

The Court refers back to the analysis provided relative to Claims 1 & 9. The record demonstrates Gable's involvement in her case and that she was able to consult with her counsel and participate in her defense. The Court also acknowledges that Gable was suffering from physical ailments and mental health issues. Gable's situation was complex, her physical difficulties stemming from a prior chemical exposure were seemingly exacerbated by her incarceration, as were her mental health issues, ultimately culminating in not one, but two suicide attempts while she was incarcerated. For this reason, Gable underwent five separate psychological evaluations before trial.

Gable was evaluated by Dean Gregg, Ph.D following her first suicide

attempt and before the suppression hearing.[5]  Gregg's May 14, 2012, evaluation

provided a mixed finding.  Gregg determined that Gable suffered from a mental

disorder. Gregg concluded, however, that Gable was competent to understand

proceedings against her.  Gable opined that Gable's ability to assist in own defense

was variable. (Doc. 7-8 at 460.)

Gable underwent a second competency exam performed by Bowman

Smelko, Psy.D following Gable's second suicide attempt in July of 2012.[6]  Smelko

found Gable unfit to proceed to adjudication as she had an insufficient present

ability to consult with her counsel with a reasonable degree of rational

understanding in order to rationally assist in her defense.  *See*, (Doc. 8-1 at 19.)

Gregg re-evaluated Gable on September 5, 2021.[7]  Gregg was unable to reach a

definitive conclusion relative to Gable's competency:

> In reviewing the evidence, I think it indisputable that she understands,
> factually and rationally, her legal situation.  I also think the evidence clearly
> shows the underlying capacity to consult with her attorney and assist in her
> defense; sustaining and exercising that capacity is the problematical area.

(Doc. 8-1 at 31.)

The Montana state district court ordered that Gable be evaluated at the

Montana State Hospital at Warm Springs.  Gable underwent a 7-week stay at the

---

[5] *See*, 5/14/12 Gregg Eval. (Doc. 7-8 at 453-460.)
[6] *See*, 7/17/12 Smelko Eval. (Doc. 8-1 at 12-19.)
[7] *See*, 9/10/12 Gregg Eval. (Doc. 8-1 at 21-33)

Montana State Hospital at the conclusion of which she was found competent.   The

evaluators noted the following issues:

> There is consistent agreement among two prior evaluators and the
> current examination team that Ms. Gable demonstrates an adequate
> factual and rational understanding of her case, as well as her role in
> the legal proceedings.  The issue of assisting her attorney in the
> preparation of her defense raised concern for both Dr. Smelko and Dr.
> Gregg. After reviewing all the information gathered during her current
> evaluation, it is our opinion that her abilities to provide her attorney
> with case-relevant information, communicate her preferences
> regarding the handling of her case, demonstrate adequate decision-
> making, and discriminate more useful from less useful information is
> sufficient to consider her fit to proceed.

(Doc. 7-8 at 506).  The evaluation went on to find that, "[a]lthough she will likely

be a difficult client to shepherd through the adjudicatory process, it is our opinion

that the difficulty is driven by her longstanding personality dysfunction rather than

a severe, disabling mental disease."  *Id*. at 509.

Smelko evaluated Gable a second time on December 13, 2012.[8]  Smelko

found Gable fit to proceed to adjudication.  (Doc. 8-1 at 40.)  Gable suggests that

she should have been evaluated again, just before trial and/or during trial, and that

absent such continued evaluations, there could be no assurance of competency.

(Doc. 2 at 49.) Despite Gable's protestations, although her competency was at

times questionable, the record demonstrates that Gable was competent to proceed

to trial. Gable may have wished to have more time before trial, Hood was prepared

---

[8] *See*, 12/13/12 Smelko Eval. (Doc. 8-1 at 34-40.)

to proceed. Trial management falls within province of defense counsel and Gable provides no authority that would have compelled Hood to request a continuance. Moreover, Gable had no constitutional right to endless evaluations.

In deciding IAC issues, courts "will neither second-guess counsel's decisions, nor apply the fabled twenty-twenty vision of hindsight." *Strickland*, 466 U.S. at 688. "The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight." *Yarborough v. Gentry*, 540 U.S. 1, 8 (2003)(per curiam). The Court accepts Hood's assertion, as an experienced trial attorney, that she was prepared for Gable's trial.

Furthermore, Gable fails to demonstrate prejudice arising from Hood's decision to proceed to trial on the date scheduled or failure to have additional pre-trial evaluations of Gable. Gable does not show that she was incompetent at her trial. Gable's speculation does not establish prejudice. *See e.g., Clark v. Lewis*, 1 F. 3d 814, 823 (9th Cir. 1993). Gable cannot meet either prong of *Martinez*. Hood did not perform deficiently and Strong was not ineffective for electing not to present this claim in Gable's PCR petition. This claim will be dismissed as procedurally defaulted.

### Claim 6- Hood performed a deficient pre-trial investigation relative to pertinent psychological issues denying Gable a fair trial, (Doc. 10 at 6); *see also*, (Doc. 2 at 50-65)

Gable suggests that her pre-trial "period of incompetency" may have

35

resurfaced at trial, during the PSI interview, or sentencing, thus, affecting her ability to make rational decisions.   Gable further suggests that perhaps a similar "period of irrationality" may have caused her to make irrational decisions on the morning of October 13, 2011.  Finally, Gable believes Hood should have argued that her diagnosed medical condition supported a potential defense of mitigated deliberate homicide.  (Doc. 2 at 50.) The Court properly addressed the issue of the "period of incompetency" before trial.  Gable was deemed competent to stand trial, and this issue will not be addressed again under the guise of a separate claim.

According to Gable she suffered a chemical injury when she was exposed to toxic chemicals called isocyanates in 1998.  The chemicals were contained in a floor sealer used on the hardwood floors in her apartment at the Minot Air Force Base. Gable argues that this condition was then aggravated in 2002 when she was exposed to anhydrous ammonia spilled during a train derailment.  *See*, Gregg Eval. (Doc. 8-1 at 22.)  Gable's physical condition apparently deteriorated over the years.  Gable faults Hood for failing to develop psychological evidence that could have supported a defense related to how these physical issues potentially impacted her mental state in the days and weeks leading up to the shootings.  (Doc. 2 at 52-58.) This claim finds no support in the record.

The social worker who met with Gable in the jail following Gable's first suicide attempt found Gable to be "hyper focused" on her physical condition and

the belief that she was ill. No collateral information supported the belief. (Doc. 7-8 at 454.) Accordingly, the State requested a competency evaluation. Gregg noticed that Gable's physical "relapses" corresponded with environmental factors corresponding to renovations occurring at the Lewis and Clark County Detention Center, such as exposure to paint fumes. (*Id*. at 455.) Gregg also observed that Gable's medical information was "conflicting." Gregg reviewed reports from Gable's more recent medical examinations in Helena that were "normal." (I*d*. at 457.) Gregg also noted in the past Gable had been treated by Maryland physician Alan Weiss for asthma, migraine headaches, and anxiety. (*Id*.) Gregg also noted that Hood had been in contact with Dr. Grace Ziem, a specialist in chemical sensitives, who had treated Gable for chemical exposure. (*Id*. at 458.) Dr. Ziem noted Gable was "vulnerable" to inflammation of the bronchial passages. (*Id*.)

Gregg outlined three possibilities for Gable's physical issues: (1) the physical problems could be psychological in nature, a somatoform disorder, in which the presence of physical symptoms were not fully explained by a medical condition (*id*. at 458); (2) anxiety disorder could be producing some of Gable's symptoms (*id*.); or (3) Gable had a factitious disorder, in which one deliberately and consciously produces symptoms because the individual obtains satisfaction in being perceived as sick. (*Id*. at 459.) Gregg also noted that some pertinent medical records were unavailable because at that time more than 15 years had

elapsed since Gable's underlying treatment.  (*Id*. at 458.)

Smelko had similar difficulty addressing the physical component of Gable's issues.  Smelko reviewed available records of Gable's 1999 involuntary hospitalization in North Dakota and observed that throughout her stay "medical personnel were unable to substantiate the majority of her medical claims."  (Doc. 8-1 at 14.)  Smelko observed that Gable's "pattern of incompetence" displayed in 1999, appears to be a reoccurring trend and "will likely present itself as more prominent when she becomes emotionally unstable, to times of relative competence when her anxiety is lowered and she is not hyper-focused on environmental sensitivities, which seem to progress into severe paranoia and disorganized behavior."  (*Id*. at 19.)

Gregg acknowledged that some evidence of Gable's medical complaints existed. Gregg also noted evidence that Gable's medical problems were "minimal or non-existent, and that Gable was either manipulative and/or there was a significant psychological component to her symptoms."  (Doc. 8-1 at 29.)  Gregg then provided 7 examples to support a finding of manipulation/psychological basis for the medical issues.  (*Id*.)

Evaluators at the Montana State Hospital found Gable not to have a mental disease or defect for purposes of the applicable state competency statute.  "Her undifferentiated somatoform disorder diagnosis acknowledges a modicum of

38

physical problems, but also reflects our own opinion that not all of Ms. Gable's somatic symptoms can be fully explained by any known general medical condition. Although ongoing complaints have been a lifelong coping strategy for Ms. Gable, they do not appear to have any relevance to adjudicatory competency." (Doc. 7-8 at 509). Also, the physical care physician at the Montana State Hospital found no evidence of Gable's respiratory system being compromised. (*Id*. at 507.)

Gable was not interested in pursuing a mental disease or defect defense during this same evaluation period. (*Id*. at 505-06.) Gable remained adamant in her innocence due to her asserted self-defense. Gable told evaluators that she "didn't do anything wrong…Three were almost dead … If somebody was trying to kill you, you would reach up. If I had it to do over again, I'd do it again." (*Id*. at 506.) Gable expressed that her desire for the trial court to hear her version of events. (*Id*.) Gable expressed this same sentiment in Gable's October 31, 2011, motion for bond reduction. (Doc. 2-5 at 5) ("[Gable] is anxious to appear in court and tell her story of what happened on October 13, 2011.")

Gable provides documents from Dr. Ziem, from 2001-02, that confirm her diagnosis of encephalopathy and restrictive airway disease from a hypersensitivity to irritants. (Doc. 2-5 at 9-14.) The only document temporal in time to Gable's criminal proceedings was a 2012 prescription from Dr. Ziem for methylcarbylamine and directing that Gable's exposure to scented products and

39

irritating agents be controlled during her incarceration. (*Id*. at 16.) Gable also provides a portion of an article from a medical textbook, apparently entitled "Chemical Sensitivity." (Doc. 2-5 at 18-9.) Gable faults Hood for not contacting her treating physician or a similar expert to provide testimony of how her diagnoses may have affected her leading up to the shootings and/or supported a mitigated deliberate homicide defense. (Doc. 2 at 55-6.) Gable relies upon *Ake v. Oklahoma*, 470 U.S. 68 (1985), in support of her claim

The U.S. Supreme Court held in *Ake* that when a defendant makes a showing that her sanity will be a significant issue in the case, the state has to provide funds for the defense to hire a psychiatrist. The need for an expert extends beyond mere presence at trial, but also to the "evaluation, preparation, and presentation of the defense." 470 U.S. at 83. Gable received multiple psychological evaluations and was also psychologically and medically evaluated at the Montana State Hospital for nearly two months. There was no definitive diagnosis for the physical issues Gable reported experiencing. It was also found that Gable was not suffering from a mental disease or defect that rendered her unable to appreciate the criminality of her behavior or to conform her behavior to the requirements of law. *See*, Warm Springs Eval (Doc. 7-8 at 509); *see also*, Mont. Code Ann. §46-14-311(1). Gable received multiple evaluations. Gable's sanity was also not a significant issue in the case for purposes of *Ake*.

40

It appears that Hood was in contact with Dr. Ziem during Gable's pretrial incarceration.  *See*, (Doc. 7-8 at 458.)  Dr. Ziem provided context for Gable's chemical sensitivities at the Lewis and Clark County Detention Center. It appears that Dr. Ziem was not able to offer a medical opinion that would explain or absolve Gable for her acts on the night of October 13, 2011. The record continually reveals Gable's insistence that Gable's actions were justified and that she wished to testify on her own behalf.  Gable's professed desire to pursue a mitigated deliberate homicide at this juncture, supported by expert testimony that she has not identified proves unavailing.  Gable's speculation and reliance upon remote medical records fails to meet the high burden of *Strickland*. Gable has failed to demonstrate that Hood performed deficiently or that she was prejudiced under Strickland. The Court declines to fault Strong for electing not to raise this claim in Gable's PCR petition. Gable cannot establish "cause" under *Martinez*.  The claim is procedurally defaulted without excuse.

### Claims 7 & 10- IAC during PSI interview process and sentencing

These claims overlap and relate to the sentencing process.  Gable first alleges that Hood provided ineffective assistance in conjunction with the PSI interview and process. (Doc. 10 at 6-7); *see also*, (Doc. 2 at 66-72.) Gable faults Hood for not adequately explaining the presentence investigation process, not accompanying her to the interview, not objecting to the release of the sealed

evaluations to the PSI writer and failing to object to the Montana state district court quoting from the unsealed competency evaluation when pronouncing sentence. *See e.g.*, (Doc. 2 at 66.) Gable also faults Hood for failing to present mitigation evidence or character witnesses at sentencing.  (*Id*. at 72.)

To the extent that Gable contests the use of her competency evaluations at sentencing, that argument is fully addressed below in relation to Claim 4.  Hood was not ineffective for allowing the PSI-writer to review the evaluations or for failing to object to the Montana state district court referencing the evaluations during the sentencing hearing.   The evaluations were relevant to Gable's sentencing and to Gable's request that she be committed to the Department of Health and Human Services. The Montana state district court already had reviewed each evaluation before sentencing.

Similarly, Hood did not provide deficient performance for failing to attend the interview.  By Gable's account, the meeting lasted one and one-half hours. Gable seems to fault Hood for not relaying concerns about Gable being exposed to contaminants at the Montana Women's Prison due to it being situated near oil refineries.  In the excerpted pages from the Presentence Investigation Report provided by Gable, it is apparent that Gable expressed these concerns directly to the PSI-writer. *See* (Doc. 2-3 at 33.)  The fact that the PSI-writer was seemingly unsympathetic to Gable's concerns does not convert this issue into one of

42

constitutional import.  The competency evaluations painting Gable's personality in an unfavorable light, *see e.g.*, (Doc. 2 at 70-1, 76), does not mean that Hood performed deficiently for not attempting to excerpt or censor portions of the evaluations.  And Gable's suggestion that Hood should have sought to limit the reports provided to the PSI-writer for sentencing conflicts with Gable's corresponding request that Hood release all of Gable's medical records to the PSI-writer because Gable "firmly believed the outcome of sentencing would be to her benefit." *See*, (Doc. 2-3 at 33.) Hood indicated to Gable that some of the medical records would not be forthcoming, as Hood did not believe the records would be helpful to Gable.  (*Id.*)  The PSI-writer received and reviewed letters from Dr. Weiss and Dr. Ziem.  *See*, (Doc. 7-8 at 1930:15-19.)

Gable suggests that Hood could have taken certain steps at sentencing, such as retaining a neuropsychologist with expertise in toxic encephalopathy to evaluate Gable and testify on her behalf, or an expert in recidivism to provide an opinion that Gable was presumably unlikely to reoffend.  *See e.g.*, (Doc. 2 at 77-8.)  But Gable has not provided this Court with reports supporting the existence of such opinions or testimony.  Gable's speculation on this claim proves insufficient.

Gable faults Hood for failing to present character evidence.  Gable suggests that Hood could have presented testimony from Pastor Chuck Redwine. It appears that Hood did contact Pastor Redwine. S*ee* (Doc. 2-2 at 41); *see also* (Doc. 2 at

75.) The Court declines to fault Hood for Pastor's Redwine's choice not to respond and/or provide a letter in support of Gable. Similarly, Hood indicated during sentencing that she attempted to contact others on Gable's behalf, but these people did not provide letters. *See*, (Doc. 7-8 at 1953:4-6.) Hood also reached out to Gable's life coach, Paula Sandin, who provided a sentencing letter for Gable. (Doc. 2-2. at 36.) Sandin's letter indicated Gable's desire to reconcile with Joe during the period from September of 2010 to September of 2011. Sandin's letter did little to mitigate Gable's criminal offenses or demonstrate her amenability to rehabilitation. Gable's father also provided a letter in support. *See e.g*., (Doc. 7-8 at 1953.)

Gable's suggestion that Hood could have called a pastor with whom she and Joe worked from 1994 to 1998 has limited value. Such a letter likely would have shown merely Gable had reached out to the pastor again September of 2011 in an effort to facilitate Gable's communication with Joe. The pastor, Jeff Kinne, apparently declined to become involved in assisting the couple in 2011. *See*, (Doc. 2 at 18-9.) Gable provides the name of another counselor with whom she had contact in 2011, as well as a couple who were acquainted with both Gable and Joe. Gable only speculates what each would have said. (*Id*. at 19-20; 75) Even accepting Gable's claim regarding the nature this testimony, the evidentiary value as it pertains to the criminal offenses and relevant sentencing considerations would

have been minimal.

Gable also argues that Hood could have called the writer of an anonymous letter, received by the Office of the Public Defender four days after Gable's arrest. (Doc. 2 at 75.)  The letter was addressed to Attorney John Moog and provides unsolicited opinion as to how an attorney might approach the defense of Gable's case.  *See*, (Doc. 2-2 at 43.) The writer of the letter was anonymous, and apparently wished to remain so. (Id.), The Court again declines to fault Hood for failing to identify the anonymous letter writer or call him or her as a witness. A review of the letter sheds little light on how such testimony could have benefitted Gable at sentencing. Gable repeatedly faults Hood for failing to present mitigation evidence on her behalf.  *See*, (Doc. 2 at 78-84.) Gable's insistence on pursuing a self-defense theory at trial hindered Hood's ability to present mitigation evidence.

Gable's belief that her actions in the shootings were justified and necessary persisted throughout the sentencing hearing.  For example, Gable made the following statement during her allocution at sentencing: "October 13, 2011, began with me wanting to speak with my husband, then having to defend myself from death or bodily harm and dealing with a loss of life.  There was no intent for harm that morning.  It was an altercation with tragic results because of physical violence with my husband."  (Doc. 7-8 at 1941:17-22.)  Gable went on to testify: "Each and every day I wish I had not reached up instinctively to turn the barrel away from my

45

head when the first shot rang out.  I wish I did not feel threatened and forced to defend myself." (*Id*. at 1943: 47.)  Finally, Gable told the Montana state district court: "I fought back on October 13, 2011, and the memory haunts me." (*Id*. at 1944:16-17.)

Gable's account of events, and insistence that her use of force was justified, remained at odds with the evidence presented during trial and obtained during the presentence investigation.  As explained by the PSI-writer:

> Although the defendant has no prior criminal history, she is a violent offender who committed a double homicide. There are no indications she has ever had issues with alcohol and/or drugs.  Despite her claim of self-defense, the facts remain:  she came to town well ahead of the murders and began the spiral: she sat in her motel room and called Joe's friends, her family members and his family members, asking them all to call Joe and "talk some sense into him."  The defendant hired a private investigator to spy on Joe and Sunday; she produced a fake Facebook page so she could snoop on her husband; she obtained firearms well ahead of the offense; she somehow obtained a key to the apartment.

> Finally, the defendant parked her car a block away, entered the apartment in the dead of night and spied through victims' personal space one last time.  Michelle Gable surprised Joe first and shot him at least two times.  Michelle Gable then pursued Sunday Bennett outside, where Ms. Bennett was likely shot multiple times with the .38 before she fled back into the house where she locked herself in the basement bedroom.  Michelle Gable shot six rounds through the door to gain access to shoot Ms. Bennett four more times.  Michelle Gable then told her husband she loved him, but that he had traded her for Sunday Bennett.  Every step Michelle took led her nearer to this fatal confrontation.  She was angry with the victims that night, and she is indifferent to them now.

> After exhaustive investigation, this officer respectfully recommends

the defendant be sentenced to the Montana Women's Prison for a
period of 100 years on each count, consecutive. Her diagnosis of
Narcissistic personality disorder tests out not only on paper but in her
actions and subsequent response to the homicides indicated she is not
amenable to rehabilitation.

(Doc. 2-3 at 34.)

The Montana state district court heard ample information that Gable suffered

from a mental disease or defect. The Montana state district court determined that

Gable's mental health issues did not rise to the level of an affirmative defense

under Montana state law. *See e.g.*, Sent. Trans. (Doc. 7-8 at 1953: 13-20.)  Gable's

continued insistence that her acts were justified, militated against a finding of

mitigating factors. The Montana state district court recognized Gable's health as to

be one mitigating factor. The Montana state district court remained "unconvinced"

that Gable's health was as bad as she presented. *See e.g.*, Judg. (Doc. 7-8 at 1966.)

The record supports this finding. Hood pursued many of the sentencing avenues

suggested by Gable. Limited favorable evidence was available. Hood also

exercised her discretion in determining that some of the sentencing information,

such as medical records and tape recordings Gable had made of conversations with

Joe and her sister, would not benefit Gable at sentencing. *See e.g.*, Sent. Trans.

(Doc. 7-8 at 1952: 18-24.)

Hood was not required to conduct an investigation into every possible

sentencing lead presented by Gable. *See Wiggins v. Smith*, 539 U.S. 510, 525

(2003) (further investigation excusable where counsel has evidence suggesting it would be fruitless); *Strickland*, 466 U.S. at 699 (counsel could "reasonably surmise…that character and psychological evidence would be of little help").  In short, Hood did not perform deficiently, and Gable has not demonstrated prejudice under *Strickland* or cause and prejudice under *Martinez*.  These two sentencing-related claims will be dismissed as procedurally defaulted without excuse.

### iii.    Claims 4 & 10: raised in PCR proceedings, but not on appeal

Gable claims that Hood provided ineffective assistance by failing to object to the district court's use of her competency evaluations during sentencing (Claim 4) and that combined effects of Hood's ineffective assistance of counsel constituted cumulative error. (Claim 10).  Gable presented these claims in the PCR proceedings but abandoned the claims on appeal.

**Pertinent Background**

In relation to Claim 4, Gable argued that her counsel's failure to object to the use of her mental health evaluations in the presentence report constituted ineffective assistance of counsel.  The Montana state district court first noted that the rules of evidence do not apply in sentencing hearings. (Doc. 7-20 at 11.)  The Montana state district court also explained that it had already reviewed the evaluations during the underlying proceedings.  (*Id*.) The pre-sentence investigator needed the information because Gable was seeking commitment to the Department

48

of Public Health and Human Services, rather than the Department of Corrections. (*Id.* at 11-12.) Finally, Gable failed to establish that such an objection was proper or would have been sustained. (*Id.* at 12.) Gable could not meet either *Strickland* prong. The Montana state district court noted that references contained in the Montana State Hospital evaluation during sentencing, including the description of narcissistic and histrionic personality traits exhibited by Gable, "had been readily observed by the Court in its dealings with Gable." (*Id.*) In relation to Gable's cumulative error claim, the district court noted that although Gable's petition identified the claim, it was not addressed in her arguments. No legal or factual authority supported this claim, and the Montana state district court declined to consider the issue further. (*Id.* at 5-6.)

**Analysis**

Gable underwent five separate mental health evaluations before Bowman Smelko, Psy.D., evaluated Gable on July 17, 2012,[9] and again on December 13, 2012,[10] with the stated purposes of these evaluations to determine whether Gable was able to proceed with her criminal case. *See*, (Doc. 2 at 39.) Dean Gregg, Ph.D., evaluated Gable on May 14, 2012,[11] and September 10, 2012,[12] in order to

---

[9] *See*, 7/17/12 Smelko Eval. (Doc. 8-1 at 12-19.)
[10] *See*, 12/13/12 Smelko Eval. (Doc. 8-1 at 34-40.)
[11] *See*, 5/14/12 Gregg Eval. (Doc. 7-8 at 453-460.)
[12] *See*, 9/10/12 Gregg Eval. (Doc. 8-1 at 21-33.)

determine if she was fit to proceed to trial. (*Id*.) Finally, Gable was evaluated at the Montana State Hospital at Warm Springs, beginning in September of 2012,[13] for a period of 7 weeks, to determine whether she lacked the capacity, due to a mental disease or defect, to assist in her own defense. (*Id*. at 39-40.)

Gable believes the Montana State Hospital evaluation exceeded the parameters of the order directing her evaluation. (*Id*.); *see also,* (Doc. 10 at 4.) Relying upon Fed. R. Crim. P. 12.2(b)(c), Gable contends that these evaluations were to be used to only determine her competency to stand trial. (Doc. 2 at 39, 41.) Gable contends that Hood provided ineffective assistance by failing to object to consideration of these evaluations at sentencing. (*Id*. at 41-43.) Gable believes the harsh sentence she received demonstrates the prejudice arising from this failure. (*Id*. at 43.)

At sentencing both Hood and Gable requested that she be committed to the custody of the Department of Public Health and Humans Services ("DPHHS") for placement at the State Hospital, rather than prison. *See e.g*., Sent. Trans. (Doc. 7-8 at 1941-1942;1944-1945; and 1953-1954.) When a defendant has been convicted of a crime but is determined by a court at the time of the offense to have been suffering from a mental disease or disorder that rendered the defendant unable to appreciate the criminality of her behavior or conform her behavior to the

---

[13] *See*, 11/30/12 Warm Springs Eval. (Doc. 7-8 at 500-509.)

requirements of law, the court must commit the defendant to the custody of the

DPHHS. *See*, MCA § 46-14-312(2). Gable squarely placed the issue of whether

Gable suffered from a mental disease or defect before the sentencing court thereby

making the prior evaluations relevant. Unfortunately for Gable, the evaluations,

particularly the Montana State Hospital evaluation which constituted the most

extensive observation of Gable, found that she did not meet the criteria for mental

disease or defect under state law. *See*, Sent. Trans. (Doc. 7-8 at 1953-54, 1956.)

Gable misplaces reliance upon the Federal Rules of Criminal Procedure as

the federal rules did not apply to her state court proceedings. The Montana state

district court was required to direct that a presentence investigation ("PSI") be

conducted. A new mental examination of Gable could have been ordered before

her sentencing hearing. Gable recently had undergone the other evaluations. It was

reasonable to allow the PSI writer to access these evaluations. And as observed by

the Montana state district court, the rules of evidence did not apply to sentencing

hearings under Montana state law. *See State v. Ferguson*, 2005 MT 343, ¶ 109,

330 Mont. 103, ¶ 109, 126 P. 3d 463, ¶ 109. The sentencing court was free to

"consider any relevant information relating to the nature and circumstances of the

crime, the character of the defendant, the defendant's background and history, the

defendant's mental and physical condition, and any other information that the

sentencing court" deemed to have probative force. *State v. Walker*, 2007 MT 205,

¶ 21, 338 Mont. 529, ¶ 21, 167 P. 3d 879 (citations omitted).  The Montana state district court already had reviewed all of Gable's evaluations during the criminal proceedings. Any objections to these exhibits would have found no support in Montana law.

Gable cannot make either prong of the requisite cause and prejudice showing under *Martinez* when considering the applicable Montana state law. The evaluations were relevant to Gable's sentencing argument, and consideration of them was not precluded by Montana state law, Gable cannot demonstrate that her underlying IAC claim against Hood is "substantial."  *See Martinez*, 566 U.S. at 14. No *Martinez* prejudice exists.

Similarly, Gable cannot show that PCR counsel provided ineffective assistance of counsel for electing not to pursue this claim on appeal after it had been denied in PCR proceedings.  Effective legal assistance does *not* mean that appellate counsel must appeal every question of law or every nonfrivolous issue requested by a criminal defendant. *Jones v. Barnes*, 463 U.S. 745, 751–54 (1983). "Nothing in the Constitution" requires "judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client." *Id.* at 754. "Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a

52

few key issues." *Id.* at 751–52.

Consequently, although it is "possible to bring a *Strickland* claim based on [appellate] counsel's failure to raise a particular claim, . . . it is difficult to demonstrate that counsel was incompetent." *Smith v. Robbins*, 528 U.S. 259, 288 (2000). Counsel did not provide ineffective assistance by electing not to pursue a meritless claim on appeal. *See Gonzalez v. Knowles*, 515 F. 3d 1006, 1016 (9th Cir. 2008) ("[C]ounsel cannot be deemed ineffective for failing to raise a meritless claim"); *Jones v. Ryan*, 691 F. 3d 1093, 1101 (9th Cir. 2012) ("It should be obvious that the failure to an attorney to raise a meritless claim is not prejudicial"); *Rupe v. Wood*, 93 F. 3d 1434, 1445 (9th Cir. 1996) (noting a failure to take futile action can never be deficient performance); *Boag v. Raines*, 769 F. 2d 1341, 1344 (9th Cir. 1985)("Failure to raise a meritless argument does not constitute ineffective assistance")  No "cause" exists under *Martinez* when PCR counsel did not provide ineffective assistance of counsel.  This claim remains defaulted without excuse.

**Claim 10**

Finally, because Gable has failed to establish a single constitutional error in this matter, no claims accumulate to the level of a constitutional violation.  *See Mancuso v. Olivarez*, 292 F. 3d 939, 957 (9th Cir. 2002). No corresponding legal basis exists to excuse the default of this claim under either *Strickland* or *Martinez*. It, too, will be dismissed as procedurally defaulted.

## IV.    Conclusion

This matter will be dismissed.  Gable has failed to make the requisite showing under § 2254(d)(2) relative to Claims 1 and 9. The Court must afford deference to the Montana state court proceedings. The claims will be denied.  The remaining claims are procedurally defaulted. Gable has not shown cause and prejudice under *Martinez* to excuse the default.  These claims must be dismissed.

## V.    Certificate of Appealability

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  Rule 11(a), Rules Governing § 2254 Proceedings.  A COA should issue as to those claims on which the petitioner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The standard is satisfied if "jurists of reason could disagree with the district court's resolution of [the] constitutional claims" or "conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484).  Where a claim is dismissed on procedural grounds, the court must also decide whether "jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Gonzalez v. Thaler*, 656 U.S. 134, 140-41 (2012) (quoting *Slack*, 529 U.S. at 484).

Gable has not made a substantial showing that she was deprived of a

constitutional right.  The Montana Supreme Court's denial of Claims 1 and 9 is entitled to deference under the AEDPA.  The remaining claims are procedurally defaulted without excuse.  Reasonable jurists would find no basis to encourage further proceedings.  A certificate of appealability will be denied.

Based on the foregoing, the Court enters the following:

**ORDER**

1.  The STAY that was previously entered in this matter is LIFTED.  The Clerk of Court is directed to amend the docket accordingly.

2.  The Petition (Doc. 1) is DENIED and DISMISSED with prejudice.

3.  The Clerk of Court is directed to enter by separate document a judgment in favor of Respondents and against Petitioner.

4.  A certificate of appealability is DENIED.

**DATED** this 18th day of March, 2025.


_____
Brian Morris, Chief District Judge
United States District Court